*UNITED STATES DISTRICT COURT*
*DISTRICT OF MAINE*

| | |
|---|---|
| *ALLYSSON A. CASTONGUAY,* ) | |
| ) | |
| *Plaintiff* ) | |
| ) | |
| *v.* ) | *Civil No. 08-222-P-S* |
| ) | |
| *BJME OPERATING CORPORATION* ) | |
| *and BJ'S WHOLESALE CLUB, INC.,* ) | |
| ) | |
| *Defendants* ) | |

*RECOMMENDED DECISION ON DEFENDANTS' MOTION FOR SUMMARY*
*JUDGMENT*

The defendants in this employment discrimination case move for summary judgment on both counts of the plaintiff's second amended complaint. Defendants BJME Operating Corp. and BJ's Wholesale Club, Inc.'s Motion for Summary Judgment ("Motion") (Docket No. 24) at 1. Oral argument was held before me on May 20, 2009. I recommend that the court deny the motion.

## I.   Summary Judgment Standard

### A.  Federal Rule of Civil Procedure 56

Summary judgment is appropriate only if the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Santoni v. Potter*, 369 F.3d 594, 598 (1st Cir. 2004). "A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party." *Rodríguez-Rivera v. Federico Trilla Reg'l Hosp. of Carolina*, 532 F.3d 28, 30 (1st Cir. 2008) (quoting *Thompson v. Coca-Cola Co.*, 522 F.3d 168, 175 (1st Cir. 2008)).

"A fact is material if it has the potential of determining the outcome of the litigation."  *Id.* (quoting *Maymi v. P.R. Ports Auth.*, 515 F.3d 20, 25 (1st Cir. 2008)).

The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  In determining whether this burden is met, the court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor.  *Santoni,* 369 F.3d at 598.  Once the moving party has made a preliminary showing that no genuine issue of material fact exists, the nonmovant must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue."  *Triangle Trading Co. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir. 1999) (citation and internal punctuation omitted); Fed. R. Civ. P. 56(e).  "As to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment to the moving party."  *In re Spigel*, 260 F.3d 27, 31 (1st Cir. 2001) (citation and internal punctuation omitted).

### B.  Local Rule 56

The evidence that the court may consider in deciding whether genuine issues of material fact exist for purposes of summary judgment is circumscribed by the Local Rules of this District. *See* Loc. R. 56.  The moving party must first file a statement of material facts that it claims are not in dispute.  *See* Loc. R. 56(b).  Each fact must be set forth in a numbered paragraph and supported by a specific record citation.  *See id*.  The nonmoving party must then submit a responsive "separate, short, and concise" statement of material facts in which it must "admit, deny or qualify the facts by reference to each numbered paragraph of the moving party's statement of material facts[.]"  Loc. R. 56(c).  The nonmovant likewise must support each denial

or qualification with an appropriate record citation. *See id*. The nonmoving party may also submit its own additional statement of material facts that it contends are not in dispute, each supported by a specific record citation. *See id*. The movant then must respond to the nonmoving party's statement of additional facts, if any, by way of a reply statement of material facts in which it must "admit, deny or qualify such additional facts by reference to the numbered paragraphs" of the nonmovant's statement. *See* Loc. R. 56(d). Again, each denial or qualification must be supported by an appropriate record citation. *See id*.

Failure to comply with Local Rule 56 can result in serious consequences. "Facts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted." Loc. R. 56(f). In addition, "[t]he court may disregard any statement of fact not supported by a specific citation to record material properly considered on summary judgment" and has "no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of fact." *Id*.; *see also, e.g., Sánchez-Figueroa v. Banco Popular de Puerto Rico*, 527 F.3d 209, 213-14 (1st Cir. 2008).

## II.  Factual Background

The following undisputed material facts are appropriately presented in the parties' respective statements of material facts submitted pursuant to this court's Local Rule 56.

BJ's[1] is a self-service, membership-based food and general merchandise warehouse club based in Natick, Massachusetts. Defendants BJME Operating Corp. and BJ's Wholesale Club, Inc.'s Statement of Material Facts Not In Dispute ("Defendants' SMF"") (Docket No. 25) ¶ 1; Plaintiff's Opposing Statement of Material Facts ("Plaintiff's Responsive SMF") (Docket No.

---

[1] The defendants refer to themselves collectively as "BJ's" throughout their statement of material facts, and I will therefore use that term of reference.

28) ¶ 1.  It employs over 20,000 workers.  *Id*.  BJ's Club Team Member Guide states, *inter alia*, that BJ's "strictly prohibits discrimination in hiring and all other terms and conditions of employment based on race, religion, color, sex, sexual orientation, age, national origin, physical and/or mental disability, marital and/or familial status, pregnancy, and military status."  *Id*. ¶ 2.[2] BJ's also has an "Open Door Policy" which encourages team members to approach management with work-related questions, issues, or problems.  *Id*. ¶ 3.  BJ's also has an Americans with Disabilities Act policy.  *Id*. ¶ 4.[3]

In 2007,  Melissa Slattery was the general manager at BJ's store (or "club") in Auburn, Maine ("Auburn Club"), and remains in that position today.  *Id*. ¶ 5.  Her job responsibilities are to run the building and oversee the club's assistant manager and nine club managers.  *Id*.  She is also responsible for sales, for all of the team members in the building, for controlling operating costs, and for making sure that club members are served properly.  *Id*.

Thomas House was the Auburn Club's customer service manager in 2007 and remains in that position today.  *Id*. ¶ 6.  His job responsibilities are to oversee the front end of the club, which involves the front-line supervisors, the membership desk, all of the cashiers, the self-checkouts, and the loss prevention position at the front door.  *Id*.  He was the plaintiff's immediate supervisor in 2007.  *Id*.

Lorie Barnies was the Auburn Club's personnel manager in 2007 and remains in that position at the present time.  *Id*. ¶ 7.  Her job responsibilities are to perform the club's hiring, manage the club's paperwork, taxes, insurance, and 401(k) plans, and provide training for team members and assist them with problems.  *Id*.

---

[2] The plaintiff purports to deny this paragraph of the defendants' statement of material facts, but then admits that the quoted language appears in BJ's Club Team Member Guide, Plaintiff's Responsive SMF ¶ 2, which is all that the paragraph asserts.  Whether the defendants abide by the Guide is a separate matter.
[3] The plaintiff qualifies her response to the fourth paragraph of the defendants' statement of material facts, but admits the portion of the paragraph set forth in the text.  Plaintiff's Responsive SMF ¶ 4.

Maureen McCann was BJ's Area Human Resources Manager from 2005 until August 17, 2007, and then was promoted to assistant vice-president manager of field human resources, the position which she currently holds. *Id*. ¶ 8. Her job responsibilities as area human resources manager were to guide and interpret the policies for the clubs that were assigned to her, which included the Auburn Club. *Id.*

The plaintiff was hired by BJ's Auburn, Maine, club as a cashier on April 30, 2004. *Id*. ¶ 9. She was given a copy of BJ's Club Team Member Guide, which states that it does not constitute an employment contract, guarantee a definite term of employment, or otherwise modify the nature of BJ's employment relationships. *Id*.[4] In September 2004, the plaintiff bid to work at the club's membership desk. *Id*. ¶ 11. Member services team members process membership applications, handle merchandise returns, exchanges and pickups, including high-priced merchandise, like electronics and jewelry, which needs to be locked up. *Id*. They also maintain membership files and address members' inquiries and complaints. *Id*. The member services job can be an active job, and these employees typically work on their feet. *Id*. ¶ 13.[5]

The plaintiff was promoted to member services/front-line supervisor in late 2004. *Id*. ¶ 14.[6] Front line supervisors oversee the front end of the store. *Id*. They are responsible for ensuring that member purchases are efficiently processed through the front line, which requires them to train cashiers, schedule their breaks and assign them work, assist with register transactions, and assist members. *Id*.

---

[4] The plaintiff admits the first sentence of paragraph 9 of the defendants' statement of material facts, presented first in this paragraph of the text. She objects to the rest of the paragraph as a "statement of law, not a statement of material fact." Plaintiff's Responsive SMF ¶ 9. The facts recited in the second sentence of this paragraph of the text are not a statement of law, and the objection as to that sentence is overruled. The plaintiff also offers a qualification of this sentence in her response, but that qualification misperceives the nature of the sentence; it does not "impl[y] that common-law 'at-will' employment principles supersede [the plaintiff's] statutory entitlements[.]" *Id*.
[5] Again, the plaintiff purports to deny this paragraph of the defendants' statement of material facts but admits the portions repeated in the text. Plaintiff's Responsive SMF ¶ 13.
[6] The plaintiff purports to deny all of paragraph 14 of the defendants' statement of material facts but admits the portions of that paragraph repeated in the text. Plaintiff's Responsive SMF ¶ 14.

In September 2006, the plaintiff sought work in BJ's cash office as a clerk.  *Id.* ¶ 19.  She applied for the position for the purpose of being trained in its duties.  Plaintiff's Statement of Additional Material Facts ("Plaintiff's SMF") (included in Plaintiff's Responsive SMF beginning at 34) ¶ 7; Defendants BJME Operating Corp. and BJ's Wholesale Club, Inc.'s Reply to Plaintiff's Statement of Additional Facts ("Defendants' Responsive SMF") (Docket No. 30) ¶ 7.  BJ's started training her for the position.  Defendants' SMF ¶ 19; Plaintiff's Responsive SMF ¶ 19.  After the training, she was one of only two people trained in the cash office.  *Id.*  When she was scheduled as a cash office clerk, the plaintiff worked in an office on the first floor of the club.  *Id.* ¶ 20.   In this position, she was responsible for the daily processing of all forms of tender.  *Id.*  She would reconcile register bags, distribute and collect register bags and keys, reconcile petty cash and safe funds, reconcile and track lottery sales and funds, count cash in the safe, and fill the cash drawers for the cashiers.  *Id.*

The plaintiff was selected as the Auburn store's "Star of the Year" for 2006 and its "Star of the Month" for April 2006.  Plaintiff's SMF ¶ 2; Defendants' Responsive SMF ¶ 2.  In or about the winter of 2007, BJ's selected the plaintiff to be responsible for training all member services team members in the implementation of the company's 2007 membership drive.  *Id.* ¶ 8.  Typically, the store's customer service manager is responsible for membership drive training.  *Id.*  The plaintiff was required to attend an off-site training session for the drive, at which she was the only non-managerial employee in attendance.  *Id.*

In April 2007, the plaintiff informed club management that she was pregnant.  Defendants' SMF ¶ 21; Plaintiff's Responsive SMF ¶ 21.  Her initial due date was December 4, 2007.  Plaintiff's SMF ¶ 18; Defendants' Responsive SMF ¶ 18.  At the time, she was a front line supervisor and one of the few employees in Auburn who was cross-trained to work in the cash

office.   Defendants' SMF ¶ 21; Plaintiff's Responsive SMF ¶ 21.[7]   A month later, she complained to Barnies and House that she was suffering from migraine headaches.  *Id*. ¶ 22.[8]  In response to the plaintiff's request in May 2007, Barnies told Slattery that the plaintiff did not want to be in the cash office and that they would need to post the job for another team member. Plaintiff's SMF ¶ 29; Defendants' Responsive SMF ¶ 29.   House also relayed the plaintiff's request to be removed from the cash office to Slattery.   *Id*. ¶ 31.   Neither Barnies nor Slattery understood at that time that there was a relationship between the plaintiff's requests to stop working in the cash office and her pregnancy.  *Id*. ¶¶ 41-42.

In July 2007, the plaintiff wrote a letter stating that she would rather quit than be scheduled in the cash office again.   Defendants' SMF ¶ 23; Plaintiff's Responsive SMF ¶ 23. When the plaintiff's replacement was selected and trained, BJ's stopped scheduling the plaintiff in the cash office.   Plaintiff's SMF ¶ 36; Defendants' Responsive SMF ¶ 36.   Her last day of work in the cash office was July 6, 2007.  *Id.*   On July 27, 2007, the plaintiff submitted a doctor's note, signed by her doctor, Dr. Commons, to her supervisor, House, which stated: "Allyson Alley [Castonguay] is my patient.   At this time in her pregnancy I recommend that she sit and rest for 15 minutes every hour while at work."   Defendants' SMF ¶ 26; Plaintiff's Responsive SMF ¶ 26.[9]

---

[7] It is the policy and practice of BJ's to cross-train its employees in multiple job classifications.  Plaintiff's SMF ¶ 13; Defendants' Responsive SMF ¶ 13.  This practice is intended to provide the company with flexibility in scheduling and filling positions in the event of an unplanned employee absence or resignation.  *Id*.  In addition, BJ's stores are restricted in the number of employees they are permitted to place in each job classification, and the practice of cross-training assists the stores in meeting their payroll limitations.  *Id*.
[8] The plaintiff purports to deny all of paragraph 22 of the defendants' statement of material facts, but in fact she does not deny the portion repeated in the text.  Plaintiff's Responsive SMF ¶ 22.
[9] The plaintiff's objection to this paragraph of the defendants' statement of material facts, directed at what "BJ's understood," is moot as I do not rely on the assertion to which she objected.  Plaintiff's Responsive SMF ¶ 26.

The plaintiff spoke with Slattery on Saturday, July 28, 2007, the first day after she brought in the doctor's note.  *Id*. ¶ 30.[10]  They met with Operations Manager Nancy Churand to discuss the requested accommodation.  *Id*.  During this meeting the plaintiff asked about the membership desk, loss prevention, and the gas station attendant positions.  Plaintiff's SMF ¶ 58; Defendants' Responsive SMF ¶ 58.  Slattery stated that she would discuss the matter with McCann and follow up with the plaintiff.  Defendants' SMF ¶ 32; Plaintiff's Responsive SMF ¶ 32.  Slattery gave the plaintiff the option of going home that day or working out the rest of the week.  Plaintiff's SMF ¶ 60; Defendants' Responsive SMF ¶ 60.

The accommodation with 15-minute breaks in blocks was continued for two days.  Defendants' SMF ¶ 32; Plaintiff's SMF ¶ 32.  Slattery called McCann and indicated that sitting for 15 minutes every hour would not work in the front line supervisor position.  *Id*. ¶ 33.[11]  McCann agreed.  *Id*.  Slattery indicated that she could easily schedule the plaintiff in the cash office where she could sit the majority of the day.  *Id*.  No decisions were made during this conversation.  *Id*. ¶ 34.[12]  On or after July 31, BJ's offered the plaintiff the cash office position full-time.  *Id.* ¶ 35.[13]

---

[10] The plaintiff purports to deny all of paragraph 30 of the defendants' statement of material facts, but in fact she admits the portions of that paragraph repeated in the text.  Plaintiff's Responsive SMF ¶ 30.

[11] The plaintiff's objection to this paragraph of the defendants' statement of material facts, Plaintiff's Responsive SMF ¶ 33, is overruled.  Her purported qualification to the effect that she "can not testify to the veracity of the representations," *id*., is irrelevant, as the substance of the paragraph is supported by citation to portions of the summary judgment record that are completely independent of any need for verification by the plaintiff.

[12] The plaintiff purports to deny all of this paragraph of the defendants' statement of material facts, but the substances of her denial does not contradict the portion of the paragraph repeated in the text.  Plaintiff's Responsive SMF ¶ 34.

[13] The plaintiff's objection to this paragraph of the defendants' statement of material facts, Plaintiff's Responsive SMF ¶ 35, is directed at "Paragraph 26 of the Defendants' Statement of Material Facts" and, in any event, is overruled.

The plaintiff, Barnies, and Slattery discussed several other potential alternatives including the gas station position and the front door loss prevention position.  *Id*. ¶ 37.[14]  BJ's could not have placed the plaintiff in these positions if it would have displaced other employees.  *Id*.  Near the end of this conversation, the plaintiff pulled out a tape recorder and informed her managers that she was taping the conversation because she was not happy with the results.  *Id*. ¶ 44.[15]  Barnies and Slattery were uncomfortable with being taped and sought to end the conversation.  *Id*.

The plaintiff contacted Dr. Commons' office on July 31 and requested another note to rule out the cash office assignment.  *Id*. ¶ 47.

The plaintiff contacted McCann by telephone, and they discussed the status of the accommodation.  *Id*. ¶ 45.  McCann stated that the company would not displace another employee in order to accommodate the plaintiff's request.  *Id*. ¶ 46.  After this conversation, McCann had a follow-up conversation with Slattery during which they discussed a number of options for the plaintiff.  *Id*.[16]  They concluded that there were no other open positions suitable for the plaintiff.  Plaintiff's SMF ¶ 73; Defendants' Responsive SMF ¶ 73.  The "discussion was the cash office or offer her a temporary leave of absence as an accommodation."  *Id*.  The decision concerning what accommodation to offer was made by Slattery.  *Id*. ¶ 75.

---

[14] The plaintiff's objections to this paragraph of the defendants' statement of material facts, Plaintiff's Responsive SMF ¶ 37, on the grounds that it fails to comply with Local Rule 56(b) and that the plaintiff is not "competent to testify concerning Slattery's analysis[,]" are overruled.

[15] The plaintiff's objection to this paragraph of the defendant's statement of material facts, Plaintiff's Responsive SMF ¶ 44, on the ground that it does not comply with Local Rule 56(b), is overruled.

[16] The plaintiff's objection to this paragraph of the defendant's statement of material facts, Plaintiff's Responsive SMF ¶ 46, that the plaintiff is not "competent to attest to the content of McCann's conversation with Slattery" is overruled since the quoted language is supported by the citation to McCann's deposition.

The plaintiff then was placed on a leave of absence. Defendants' SMF ¶ 49; Plaintiff's Responsive SMF ¶ 49.[17] After the plaintiff was placed on leave, BJ's made sure that she took advantage of all paid vacation and sick time available to her. *Id*. ¶ 50. During this time, BJ's tried to get more information from the plaintiff about her limitations and her abilities in order to assess what positions she could perform. *Id*. On October 17, 2007, the plaintiff presented a third doctor's note, which clarified for BJ's that the plaintiff's sitting restriction could be performed intermittently rather than consecutively. *Id*. ¶ 51.[18] On October 24, 2007, BJ's sent a letter to the plaintiff recapping its understanding of the situation and including a detailed questionnaire for the plaintiff's doctor to complete. *Id*. ¶ 52.

The plaintiff's doctor completed this questionnaire on or about November 1. *Id*. ¶ 53. The completed questionnaire indicates that the plaintiff "can't lift more than 25 lbs" and can cover the registers or membership desk when necessary "as long as she has the option of sitting," which was described as a "sitting break up to 15 minutes per hour – per her comfort." *Id*. BJ's was then able quickly to find a suitable position for the plaintiff without displacing existing employees and offered the plaintiff a position as a merchandise demonstrator in November 2007. *Id*. ¶ 54. The presentation of the questionnaire coincided with a demonstrator position becoming available, and the plaintiff returned to work as a merchandise demonstrator on November 12. *Id*. The merchandise demonstrator position is one in which employees distribute samples of food and other items to customers. *Id*.

The demand for demonstrators varies depending on the needs of BJ's vendors. *Id*. ¶ 55. There may be days when no demonstrators are working. *Id*. In the summer of 2007, very few

---

[17] The plaintiff purports to deny all of paragraph 49 of the defendants' statement of material facts, but in fact she does not deny the portion of that paragraph that is included in the text. Plaintiff's Responsive SMF ¶ 49.

[18] The plaintiff qualifies her response to this paragraph of the defendants' statement of material facts, asserting that "there is no evidence that the restriction could not have been performed intermittently at the time she was placed on leave." Plaintiff's Responsive SMF ¶ 51.

demonstrators were requested by vendors.  *Id*.  Typically, demonstrators are in greater demand during the late fall and the holiday season.  *Id*.  After two days of demonstrator training and work, the plaintiff called in sick on November 15.  *Id*.  ¶ 56.  She then had an emergency caesarian section delivering her baby approximately a month early.  *Id*.  She took another leave of absence and collected short-term disability benefits.  *Id*.

The plaintiff never returned to work following her pregnancy.  *Id*. ¶ 57.  She knew that BJ's expected her to return and kept a job for her.  *Id*.  BJ's continued to pay the employer portions of the plaintiff's medical insurance and other benefits, long after the plaintiff was scheduled to return to work in January 2008.  *Id*.  The plaintiff attempted to apply for unemployment benefits but withdrew her application upon the realization that she was still employed by BJ's.  *Id*. ¶ 58.  The plaintiff's benefits ended only when she called BJ's in March 2008 to cancel them.  *Id*. ¶ 59.  She told BJ's to shut off her benefits and she chose not to return to work because she felt it would be awkward.  *Id*.

A full-time BJ's hourly employee is typically scheduled for a five-day, 37.5 hour work week, with seven and a half hours per day.  Plaintiff's SMF ¶ 105; Defendants' Responsive SMF ¶ 105.  BJ's Auburn store has a single entrance and exit for its customers and schedules a single front door/loss prevention employee at this entrance/exit.  *Id*. ¶ 120.  The store is open seven days a week from 9:00 a.m. to 9:00 p.m.  *Id*. ¶ 121.   At the time the plaintiff took leave, the only employee classified for the front door/loss prevention position was working there full-time, five seven and a half-hour shifts per week.  *Id*. ¶¶ 123-24.  The store schedules one employee to work in the cash office per day, from 8:00 a.m. to 4:00 p.m.  *Id*. ¶ 163.

BJ's corporate personnel policies are maintained in an on-line manual.  *Id*. ¶ 165.  Those policies apply to employees at the Auburn store.  *Id*.  The policies are also described in an

employee handbook.  *Id.*  BJ's employee break policy provides that any employee who works in excess of six and a half hours a day is entitled to two paid 15-minute breaks and a 30-minute unpaid lunch break per shift.  *Id.* ¶ 166.

It is Slattery's understanding that it is BJ's policy and practice to accommodate an employee's job limitation request as best the company can.  *Id.* ¶ 169.  It has also been the practice of BJ's Auburn store to accommodate employee job limitations as best the store is able to do.  *Id.*  The effort to accommodate an employee's job limitations can include placing an employee in a different position from those for which he or she is classified if there is an opening and he or she is trained for the position.  *Id.* ¶ 174.

### III. Discussion

The second amended complaint alleges unlawful employment discrimination based on sex under the Maine Human Rights Act, 5 M.R.S.A. §4551 *et seq.* ("MHRA") (Count I) and unlawful employment discrimination based on sex under 42 U.S.C. § 2000e *et seq.* ("Title VII") (Count II).  Second Amended Complaint (Docket No. 20) ¶¶ 48-65.  Title VII defines the term "on the basis of sex" to include "because of or on the basis of pregnancy."  42 U.S.C. § 2000e(k).  The MHRA has a similar definition.  5 M.R.S.A. § 4572-A(1).

The defendants present a combined argument on both claims, Motion at 12-20, because pregnancy discrimination claims under the state statute are analyzed under the same framework as pregnancy discrimination claims under Title VII.  *Green v. New Balance Athletic Shoe, Inc.*, 182 F.Supp.2d 128, 135 (D. Me. 2002).  The plaintiff agrees with this construct.  Plaintiff's Opposition to Defendant[]s['] Motion for Summary Judgment ("Opposition") (Docket No. 27) at 6 n.1.  The parties also agree that the burden-shifting framework set forth in *McDonnell Douglas*

*Corp. v. Green*, 411 U.S. 792 (1973), applies to the consideration of this motion.  Motion at 11; Opposition at 6.

### A.  The Plaintiff's *Prima Facie* Case

While agreeing that the *McDonnell Douglas* burden-shifting framework applies, the parties do not agree on the legal standard that applies to the plaintiff's *prima facie* claims.

Citing case law from the District of Maine, the defendants pose this standard as requiring the plaintiff to show that (1) she was pregnant at the relevant time, (2) and was capable of performing her job adequately, but (3) her employer took some adverse employment action against her, (4) while treating non-pregnant employees differently.  Motion at 12.

The plaintiff, citing case law from the Sixth and Tenth Circuits, contends that the standard, properly stated, requires her to show (1) that she was pregnant at the relevant time, (2) that she was qualified for, and capable of performing, the modified-duty positions she sought, but (3) that the employer took an adverse employment action against her, and (4) treated her differently from other, non-pregnant employees who had a similar ability or inability to work.  Opposition at 6-7.

I will continue to use the formulation of the test that has been used by this court in the recent past, adopting the defendants' version of the second prong of the four-part test.  *See, e.g., Davis v. Emery Worldwide Corp.*, 267 F.Supp.2d 109, 119 (D. Me. 2003) (disparate treatment case; *aff'd* Aug. 11. 2003, Civil Docket No. 02-228-P-H); *Green*, 182 F.Supp.2d at 135 (disparate treatment case).  This formulation does not foreclose consideration of the plaintiff's alleged qualifications for and ability to perform positions other than the one she held at the time her physician imposed physical limitations on her due to her pregnancy.  *E.g., Green*, 182

F.Supp.2d at 135-40.[19]   It does require that the plaintiff show that the defendant acted purposefully.  *Smith v. F. W. Morse & Co.*, 76 F.3d 413, 420 (1st Cir. 1996).

The parties agree that the first element of either test is satisfied in this case.  Motion at 12; Opposition at 7.

With respect to the second element of the test, the defendants contend that the plaintiff "was not capable of adequately performing her basic job functions as a Front Line Supervisor due to her medical restrictions."  Motion at 12.  They add, "according to her treating physician she could not perform the standing or lifting components of not only the FLS [Front Line Supervisor] position but of any job that required standing or lifting."  *Id.* at 13.  The plaintiff disputes these assertions indirectly, contending that she "possessed the basic skills necessary to perform the modified-duty assignments" of "member services, loss prevention, gas station attendant, damaged and defective area and FLS."  Opposition at 7.[20]

In referencing her "medical restrictions," the defendants are presumably referring to the doctor's note submitted by the plaintiff on July 27, 2007, stating that the doctor recommended that "she sit and rest for 15 minutes every hour while at work."  Defendants' SMF ¶ 26; Plaintiff's Responsive SMF ¶ 26.[21]   They contend that they attempted to implement this

---

[19] To the extent that the plaintiff means to suggest that her ability to perform modified-duty positions allows her to displace other, non-pregnant employees, she is mistaken.  The state and federal statutes at issue in this case prohibit discrimination on the basis of pregnancy; they do not require favoritism on that basis.  *Armindo v. Padlocker, Inc.*, 209 F.3d 1319, 1321 (11th Cir. 2000); *Kucharski v. Cort Furniture Rental*, 594 F.Supp.2d 207, 211 (D. Conn. 2008).

[20] The defendants argue that the legal analysis of a pregnancy discrimination claim "does **not** take into consideration whether the employee can adequately perform her job with or without a reasonable accommodation as is the standard under the A[mericans with] D[isabilities] A[ct] because the P[regnancy] D[iscrimination] A[ct] forbids discrimination on the basis of sex, not on the basis of handicap."  Motion at 11 (emphasis in original).  This is not a distinction drawn by the case law cited by the defendants in this portion of their memorandum of law, nor is it consistent with much of the case law dealing with claims of pregnancy discrimination, where reasonable accommodation is often at issue.  *See, e.g., Green*, 182 F.Supp.2d at 139 ("There are simply no facts in Plaintiff's Statement of Material Facts to support the inference that Defendant granted these accommodations to other, non-pregnant employees, while not providing them to Plaintiff.").

[21] The plaintiff's objection and qualification, Plaintiff's Responsive SMF ¶ 26, do not apply to the portion of this paragraph that is recited in the text, and in fact, the plaintiff's response admits that portion of the paragraph.

14

restriction while the plaintiff worked as a front line supervisor, but, during a two-day trial period, "the front end of the store was run haphazardly, and was at times chaotic.  Customer service suffered."  Motion at 5; Defendants' SMF ¶¶ 28-29.  The plaintiff disputes these assertions.  Plaintiff's Responsive SMF ¶¶ 28-29.  This is the only evidence offered by the defendants to support their assertion that the plaintiff could not perform her existing job adequately, which in turn is the only argument they offer with respect to the second element of the test.  Accordingly, there clearly are disputes of material fact with respect to the second element of the test, and it need not be discussed further.

With respect to the third element of the test, adverse employment action, the defendants assert that they did not take any adverse employment action "when [BJ's] placed [the plaintiff] on a temporary leave of absence in order to clarify her capabilities and search for an open position that met her restrictions."  Motion at 13.[22]  Notably absent from the defendants' statement of material facts is any assertion that the plaintiff requested the temporary leave of absence or that she received her customary rate of pay while on the leave.[23]  Nor is there any assertion that similarly-situated non-pregnant employees, *i.e.*, those requiring 15 minutes to "sit and rest" per hour and unable to lift more than 25 pounds, have been placed on involuntary,[24] unpaid leaves of absence by the defendants.  Indeed, all of the information submitted by the

---

[22] Contrary to the defendants' suggestion, Motion at 13 n.10, neither the judge in *Gratton v. JetBlue Airways*, 2005 WL 1251786 (S.D.N.Y. May 25, 2005), at *6, nor the Appendix to the EEOC Guidelines for the Pregnancy Discrimination Act quoted therein, states that "granting" an involuntary leave without pay, whether or not benefits are maintained, cannot be an adverse employment action.

[23] The assertion in the defendants' reply memorandum that "BJ's took steps to insure that Castonguay cashed in all of the compensatory time available to her," Defendants BJME Operating Corp. and BJ's Wholesale Club, Inc.'s Reply Brief (Docket No. 29) at 3, is not supported by any citation to the defendants' statement of material facts and, from all that appears, not properly before the court.  The court will not consider direct citations to affidavits or deposition transcripts that appear in a memorandum of law in connection with a motion for summary judgment; only citations to a statement of material facts, to which the opposing party has an opportunity to respond, may be considered.

[24] The plaintiff's statement of material facts provides evidence, albeit disputed by the defendants, to the effect that the leave of absence was involuntary.  Plaintiff's SMF ¶¶ 56, 60, 67.  The defendants' objection to paragraph 56 , Defendants' Responsive SMF ¶ 56, is overruled.  Similarly, the plaintiff offers evidence that no other employee of the store at which she worked had ever been put on an involuntary leave.  Plaintiff's SMF ¶ 82.

defendants about other employees who took leaves of absence involves requested leaves. Defendants' SMF ¶¶ 60-67, 69-72.   An involuntary, unpaid leave, even if benefits are maintained, certainly could constitute an adverse employment action.   *Tysinger v. Police Dep't of Zanesville*, 463 F.3d 569, 573 (6th Cir. 2006); *see also Blackie v. Maine*, 75 F.3d 716, 725 (1st Cir. 1996) (adverse employment action includes reduction in salary or divesting employee of significant responsibilities).

With respect to the fourth element of the test, the defendants assert that the plaintiff cannot show that she was treated less favorably that other similarly-situated employees, apparently because she was the store's first temporarily-disabled employee who requested to be accommodated for over four months.   Motion at 14-16.   But, it cannot be the law that an employee cannot recover for pregnancy discrimination merely because her employer has never had an employee with identical physical limitations, other than pregnancy, and an identical job, hours, and length of the necessary accommodation.   This court's case law certainly suggests otherwise.

Thus, in *Green*, the issue with respect to the fourth element of the plaintiff's *prima facie* case was whether the plaintiff "was treated differently than other, non-pregnant employees with a similar ability or inability to work."   182 F.Supp.2d at 138.   *See also Davis*, 267 F.Supp.2d at 119 (citing *Green*).   I see no reason to restrict the test any further, as the defendants would have the court do.   When the test is whether non-pregnant employees with similar lifting or standing/sitting restrictions were treated differently from the plaintiff, the plaintiff has proffered a limited amount of evidence which would reasonably be construed by a factfinder to meet this

test.  *See* Plaintiff's SMF ¶¶ 127-29, 133, 178, 190.[25]  In light of the defendants' limited argument on this issue, Motion at 15-16, and the fact that intentional discrimination may reasonably be inferred from the evidence proffered by the plaintiff, I conclude that the plaintiff has established her *prima facie* case for purposes of the defendants' motion for summary judgment.

## B.  Defendants' Nondiscriminatory Reason

Under these circumstances, the burden now shifts to the defendants to articulate a nondiscriminatory reason for taking the adverse action.  *Smith*, 76 F.3d at 421.  After that "modest hurdle" is cleared by the defendants, the plaintiff "must then prove that the employer's proffered justification is a pretext for discrimination."  *Id*.  Here, the defendants assert that "BJ's has stated legitimate business reasons for offering Castonguay a leave of absence," Motion at 16, specifically, that "there was legitimate confusion regarding Castonguay's restrictions and that it was reasonable to place Castonguay on a temporary leave of absence in order to find her a suitable position."  Motion at 18.  The plaintiff chooses not to respond to this argument, moving instead directly to a discussion of the evidence which she maintains would allow a reasonable factfinder to conclude that the defendants' proffered reason is a pretext for discrimination.  Opposition at 14-20.   I accordingly find that the defendants have cleared their "modest hurdle" and proceed to that portion of the analysis as well.

## C.  Pretext

The plaintiff attacks several reasons upon which the defendants might have relied to support the decision to place the plaintiff on leave, including that BJ's could not take particular jobs or hours away from other employees, and that the plaintiff rejected offers of positions

---

[25] The defendants' objections to paragraphs 127-28, 178 and 190 are overruled.  In one of the cited paragraphs, the defendants' purported qualification lacks any citation to the summary judgment record and must be disregarded.  *Id*. ¶ 190.

compatible with her restrictions.  Opposition at 15-18.  It is not clear that the defendants' motion relies on either of these reasons.

If it in fact does, the plaintiff has submitted sufficient evidence to allow a reasonable factfinder to infer that the first explanation was a pretext.  The plaintiff has proffered evidence that hours were available in several jobs for which she was qualified, and there is no evidence in the summary judgment record to the effect that the defendants could not or would not offer an employee full-time hours by scheduling her for two or more different jobs at different times during a given week.  In addition, the plaintiff has offered evidence that, if she did work full-time in the cash office, as was suggested by the defendants, she would have displaced  work already assigned there.  Plaintiff's SMF ¶¶ 129-30, 163-64.

With respect to the second explanation, that the plaintiff rejected positions compatible with her restrictions, the only position for which there is evidence that the plaintiff declined is the cash office position. The plaintiff contends that she was offered that position after she had been removed from that position by agreement at her request due to her migraine headaches.  *Id*. ¶¶ 55-60.[26]   While not "compelling," as the plaintiff characterizes it, Opposition at 14, this would be enough evidence to allow a reasonable factfinder to conclude that the proffered reasons were pretextual.

Insofar as the analysis of pretext requires evidence that the discrimination at issue was intentional, I have already discussed in connection with the plaintiff's *prima facie* case my conclusion that there is sufficient evidence in the summary judgment record of intentional discrimination based on the plaintiff's pregnancy to allow the question whether BJ's allegedly discriminatory conduct was intentional to go to the factfinder.

---

[26] The defendants' objections to paragraphs 55 and 56 of the plaintiff's statement of material facts, Defendants' Responsive SMF ¶¶ 55-56, based on alleged differences between the plaintiff's answers to interrogatories and her deposition testimony, are overruled.

With respect to the single reason advanced in the defendants' motion, that there was confusion about the plaintiff's medical restrictions and that the plaintiff was placed on a temporary leave of absence until a suitable position could be found, the plaintiff contends that the lifting restriction on which the defendants now rely was not made known to them until October, 2007, long after her involuntary leave began on July 31, 2007, and that the defendants "did not seek medical clarification" from her until October 23, 2007.[27]  Opposition at 18-19.  The evidence to which the plaintiff refers does not establish irrefutably that the defendants' proffered reason is pretextual, but it is enough, although minimally,[28] to allow the plaintiff to avoid the entry of summary judgment on her claims.  The list of facts that the defendants characterize as "undisputed" evidence of "BJ's good faith and utter lack of pretext," Motion at 19-20, are also not conclusive.[29]  The evidence on this point will have to be weighed by a factfinder at trial.

### III.  Conclusion

For the foregoing reasons, I recommend that the defendants' motion for summary judgment be **DENIED**.

---

[27] The assertion at oral argument by counsel for the plaintiff that the defendants' position on this point was based on "perjury or a severe Rule 11 violation" goes well beyond what is suggested by the dispute as presented in the summary judgment record.

[28] I disagree with the assertion of counsel for the defendants at oral argument that there is "much less" evidence of pretext in this case than was present in *Davis* or *F.W. Morse*.  Pretext was not a focal issue in either case.

[29] They are also not all "undisputed."  *See* Plaintiff's Responsive SMF ¶¶ 28-29, 54.

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum, within ten (10) days after being served with a copy thereof.   A responsive memorandum shall be filed within ten (10) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

Dated this 21st day of May, 2009.

/s/  John H. Rich III
John H. Rich III
United States Magistrate Judge